# CHARLESTON.

HINCHMAN, ADMR. *v.* BALLARD, ADMR.

February 23, 1874.

I. When the court erroneously makes an order that unless a person who is not a party to the bill, is so made, within thirty days from the date of the order, by amended bill, that the plaintiff's bill should stand dismissed, with costs to the defendants, without prejudice to any other suit, &c., and the plaintiffs failed to make such party a defendant by amended bill, or otherwise, within the thirty days or afterwards. And the defendants afterwards, and after the thirty days had expired and before any other action was taken in the cause by the court, or any of the parties appeared in court and asked and obtained leave of the court, without objection, to file a cross bill in the cause, against the plaintiffs in the original bill, and, in pursuance of such leave, did file such cross bill, to which the defendants filed their answers and plaintiffs and defendants afterwards took and filed the depositions of various witnesses in support of their pretentions in the original cause, and various orders and decrees were afterwards made by the court in the proceedings, on both the original and cross bills, including the decree adjudicating the principles of both causes from which the appeal is taken as though said order of conditional dismissal had never been made, without objection being made or taken, by the court or any of the parties to the cause, proceeding further in the cause, at any time, after the expiration of the said thirty days: It is too late for the appellants, who were defendants below, to be heard in the appellate court, to object that the original cause at and after the expiration of the thirty days from the date of said order of conditional dismissal become, and was, dismissed by virtue of such order, and that all subsequent proceedings of the court in the causes, were, in consequence thereof, irregular and inoperative or void. In such case the appellate court will ordinarily consider that the causes were proceeded with by the court by consent of parties.

II. If, in the case above stated, the person so directed to be made a party to the original cause, was a necessary and proper party thereto, under the circumstances above stated, the appellate court will not reverse and set aside the decree of the court below adjudicating the principles of the cause, because of such conditional order of dismissal and give full effect thereto; but in such case the appellate court will ordinarily reverse the decree appealed from, and direct such person to be made a party, and the cause to be proceeded with, as though such conditional order of dismissal had never been made.

III. A copy of an order of the county court of Alleghany county Commonwealth of Virginia, attested by the clerk of such court, may be received and read as evidence in lieu of the original, by the courts of this State, under the provisions of the act of the Legislature of 1866, upon that subject, which is incorporated into the Code of this State, of 1868, in sections five, six and seven of chapter one hundred and thirty.

IV. A copy of such order, so attested, is proper evidence of the appointment, by the county court of said Alleghany county, of a committee of an insane person.

V. When a demurrer is filed to a bill and the court proceeds to adjudicate, and does adjudicate, the principles of the cause, in favor of the plaintiff, without first acting *pro forma* upon the demurrer, it will be considered that the court in rendering the decree adjudicating the principles of the cause considered the sufficiency of the bill, and substantially overruled the demurrer thereto, and this Court will not reverse the decree, adjudicating the principles of the cause, for this cause alone.

VI. L. by contract in writing, under seal executed by him, and J. and H. sells to J. and H. several tracts of land for a stipulated price to be paid by J. and H. to L. at stated times; and under and by virtue of the contract of sale. J. and H. are put in actual possession of the lands by L. and J. and H. in pursuance of such contract, pay a large amount of the purchase money, but not all of it, and it is applied in discharge of purchase money liens existing against part of the land. Afterwards, and while J. and H. are in possession of the land under such contract, and before all the purchase money is paid by J. and H., L. P. H. is appointed committee of L., who is then insane, by the county court. After his appointment as committee, L. P. H. filed a bill in the circuit court of the county where the land was situated against J. and H. and others, to rescind and annul said contract of sale, upon the ground that L., at the time of its execution, was insane. Afterwards, and while the suit was pending, L. P. H., committee, and J. and H. executed

20

a paper writing in these words, to-wit: "This article of agreement, made and entered into this the 29th day of March, 1861, between Lewis P. Holloway, committee of D. B. Layne, of the one part and William Hinchman, Jr., and Thomas Johnson, of the other part, witnesseth: That the said Lewis P. Holloway pledges himself to come to the house of the said Thomas Johnson on the 18th day of April, 1861, for the purpose of consummating a compromise in a suit in chancery, instituted in the circuit court of Monroe county, in which said Holloway is plaintiff and the said Hinchman and Johnson are defendants, upon the following terms here agreed upon, to-wit: That the said Lewis P. Holloway binds himself to pay to said Johnson and Hinchman the amount of money they have paid John Echols for land bought of D. B. Layne, with interest from the time of said payment until all is refunded by said Holloway; and said Holloway is to return them, the said Hinchman and Johnson's bonds given to said Layne for purchase money of said land; and the said Holloway is to pay said Johnson and Hinchman's lawyer's fee, amounting to $200, and is to dismiss the said suit upon the terms, to-wit: that each party is to pay his own costs in said suit. The said Johnson and Hinchman are to pay to the said Holloway rent for the said land during the time they occupied it, and the said Johnson and Hinchman are to have possession of said land until Christmas, and have the privilege of moving their grain, &c., and are to pay said Holloway for the corn and oats they sow and raise this season, the usual grain rent; and the said Holloway is to pay the said Johnson and Hinchman for the improvements they have made upon said land, and if they cannot agree as to the value of said improvements, they are to choose disinterested persons to value the same. The said Holloway is to take for the rent of the islands rented by the said Hinchman and Johnson the usual grain rent or the rent that Johnson and Hinchman are to get for same. Witness the following signatures and seals:

(Signed.)          Lewis P. Holloway, Com.,     (Seal.)
                   Thomas Johnson,              (Seal.)
                   William Hinchman, Jr.,       (Seal.)

L. P. H. died after the date of this agreement without ever having done any act towards consummating the same. L. also died insane. J. and H. continued in the possession of the lands as before. J. and H. never saw L. P. H. after the date of said agreement. After the death of L. P. H. and L., and in October, 1866, J. and H., still in the possession of said lands and without having actually performed any part of said agreement, filed their bill, in the circuit court of the county of Monroe, in this State, where the lands are situated, against the personal representative and legal heirs of L., &c., for the specific execution of said agreement of compromise; and the bill does not allege that L. was insane at the date of the contract by him to plaintiffs—HELD:

1. That as the said agreement of compromise, if it were complete and final and carried into effect, would change the nature and condition of the estate of L. (the insane person), L. H. P., as committee had no authority to make the same, so as to bind the personal representative and legal heirs of L. without the approbation or direction of the court by which he was appointed committee, or of some other court having jurisdiction of the subject.

2. That as the said agreement of compromise was made by the committee without the approval or direction of the court by which he was appointed, or of any court having jurisdiction of the subject, a court of equity will not decree a specific execution thereof, as against the personal representatives and legal heirs of L., unless it appears to the satisfaction of the court that the agreement was beneficial and advantageous to L. or his estate.

3. Although a committee of an insane person may sue to set aside a deed or contract of the insane person, touching his estate, made prior to the time he was appointed committee, upon the ground that such insane person was insane at the time of making such deed or contract of sale: Still if the committee does bring such suit, and, while the suit is pending, he makes an agreement of compromise with the defendant, which, if carried into effect, will change the nature and condition of the estate of the insane person, without the direction or approval of the court having jurisdiction of the subject, a court of equity will not in another suit, decree specific performance of such agreement of compromise against the personal representatives and legal heirs of the insane person, unless it appears that the insane person was insane at the time of the making of the deed or contract, and that the agreement of compromise was beneficial and not injurious to the insane person or his estate.

4. Generally, the conduct and acts of a committee of an insane person, in relation to the estate of such insane person, are subject to the direction, approval or disapproval of the court having jurisdiction of the subject.

5. That the fact that the committee of an insane person is authorized by law to sue and be sued, touching the estate of such insane person, does not, in and of itself, authorize the committee to compromise a suit brought by him, so as to change the nature and condition of the estate of the insane person.

6. It appearing in this case, that L. at the time he made the contract of sale of the lands was sufficiently sane to make the contract, and that the contract was beneficial to his interests, and

1874.
January Term.

it not appearing that the contract of sale is invalid, for any cause, or that the agreement of compromise was beneficial to the interest of L., (the insane person), *for these reasons alone,* a court of equity ought to refuse to decree specific execution of the agreement of compromise, (if it were complete and final on its face), against the personal representative and legal heirs of L.

7. The said agreement of compromise, if it were not otherwise objectionable, is not such a final, completed contract, as a court of equity will enforce, by decree of specific performance.

8. It appearing that L. had purchased from T. the larger part of the land sold by him to J. and H. (the plaintiffs in the original bill), and that, at the time of the sale from L. to J. and H. and afterwards, there was a large amount of purchase money due from L. to T., on the land so purchased by L. from T., and that T. had never conveyed the same to L., and that T. was dead, and at his death his purchase money was unpaid, and it not appearing that the legal heirs of T. ever conveyed the land, it was error in the court below to decree the sale of the land, so sold by T. to L. without the personal representative and legal heirs of T. being made parties to the cause and regularly brought before the court by proper process.

9. It was not error in the court below to allow the personal representative and heirs of L. to file a cross-bill, in the original cause of J. and H. aforesaid, asking the court to confirm the original contract of L. with J. and H. for the sale of the land, and to sell the land to pay the unpaid purchase money, due the estate of L. deceased; but the personal representative and legal heirs of said T. deceased, as well as all other parties in interest, should be made parties thereto.

An appeal from a decree of the circuit court of Monroe county, by the respondents in a suit in chancery pending in said court, wherein John Hinchman, in his own right and as administrator of William Hinchman, Jr., deceased, Andrew Hinchman, Mary Hinchman, Thomas Johnson and Minerva, his wife, Andrew A. Miller, James Miller, Elizabeth B. Miller, George Miller, Samuel W. Beard, and Sarah, his wife, George W. Poage and Cornelia A., his wife, William B. Johnson and Agnes, his wife, and T. A. George and Mary S., his wife, were complainants, and Lewis Ballard, sheriff of said Monroe county, and as such administrator of Douglas B. Layne, deceased, Ann B. Layne, John J. Paxton and Eliza, his wife, Orville

T. Rodgers and Elmira, his wife, William B. Sprowl and Catharine S., his wife, Robert A. Dickson and J. Emma, his wife, Marietta Layne, Mary D. Layne, Thomas G. Alderson, Sarah Davis, Charles, L. Davis, Lewis Davis, Sidney Davis, Mary Davis and Lock Davis, were respondents. The decree from which the appeal was taken was pronounced on the 8th day of August, 1871, by the Hon. Joseph M. McWhorter, judge of the said circuit court.

The opinion of the court contains a sufficient statement of the facts and pleadings, and of the statutes therein referred to.

*William Skeen,* of Virginia, *Caperton &. Patton* and *James W. Davis* for the appellants.

*Samuel Price* for the appellees.

HAYMOND, PRESIDENT:

This cause was commenced in the circuit court of the county of Monroe in October, 1866, and the bill therein was filed at November rules of that year. The bill alleges that on the 3d day of March, 1859, Thomas Johnson and William Hinchman, Jr., purchased of Douglas B. Layne three tracts of land, two of them called islands, one of which Layne purchased of General A. W. G. Davis, and the other of Col. John Alderson, and both together containing thirty-five acres; the third tract containing four hundred and fourteen acres, more or less, which Layne purchased from Doctor Taylor, of Rockbridge county, and that Layne was to make them a good title by the first of December thereafter, but he was only to make such title to the islands as was vested in him; that afterwards, on the 23d day of November, 1859, Layne assigned a copy of the title bond of Davis and Alderson to Johnson and Hinchman, Jr. The copy of the title bond, with the assignment thereon by Layne, is filed with the bill, marked "No. 2:" That a deed of conveyance was made by Colonel John Alderson to Johnson and Hinchman for the lot which he was to convey, and is of record

in the county of Monroe; that no deed was ever made by Davis and Alderson, the former of whom has died, leaving several legal heirs, who are named, and who are made defendants to the bill; that no title · was or has been made for the tract of four hundred and fourteen acres; that Johnson and Hinchman were to pay $6,000 by the first of December, 1859, and $6,000 in annual instalments of $1,000, the whole to draw interest from the first day of December, 1860, for the lands; that the first $6000 was paid according to contract; and that sometime after the purchase, the county court of Alleghany county, Virginia, appointed a committee for the said Layne upon the ground that he had lost his mind, and was no longer capable of taking care of his person and property; that on the 4th day of September, 1860, the committee, Lewis P. Holloway, instituted suit in the circuit court of Monroe county, against Hinchman and Johnson, alleging in his bill that Layne was imbecile when the contract was made—incapable of making a contract, and that the lands had been sold at a price greatly below their value, and asking for a recision of the contract; that Hinchman and Johnson answered the bill, denying the material allegations thereof, and many depositions were taken in the cause; that in this attitude of the cause, Holloway, the committee, and Johnson and Hinchman compromised the suit, and agreed to recind the contract, restoring the parties to their original positions. A copy of this contract, marked No. 4, and a copy of the original contract are alleged to be filed with the bill; that by the compromise, Holloway, as committee, was to refund the money that was paid, with its interest; the outstanding bonds were to be returned, and Holloway was to pay a lawyer's fee of $200; to dismiss the suit, each party paying his own costs; that Johnson and Hinchman were to pay rent for the land during the time they occupied the property, and were to have possession of the land until Christmas next thereafter; that Holloway was to pay for improvements; that if the parties could

not agree upon the adjustment, they were to refer the subject in dispute to arbitrators, and he (Holloway) was to come to Monroe county before Christmas and have the adjustment made; that Holloway failed to come, and Johnson and Hinchman selected two of their respectable neighbors, George W. Swope and Charles R. Hines, who examined the improvements and estimated the rents, and made a report, which is alleged to be filed with the bill, marked "No. 5." The bill also alleges that Holloway and Layne have both died since the making of the compromise, and that the estate of Layne has been committed to Lewis Ballard, sheriff of Monroe county, for administration; that the suit brought by Holloway, committee, has been discontinued; that William Hinchman, Jr.. died intestate, unmarried and without child or children, leaving his father William Hinchman, his heir at law, and that William Hinchman, the father, has since died intestate, leaving a widow and divers children and legal heirs, who are named, and that plaintiff John Hinchman, is administrator of William Hinchman, Jr., deceased. It is also alleged that Layne died intestate, leaving a widow, Ann B. Layne, and several children and legal heirs, and that Layne left no personal estate in West Virginia; and that none will likely come into the hands of his administrator. The administrator of Layne, his widow and legal heirs are made defendants, and the bill prays that the contract of compromise made with Holloway, the committee, be enforced; that the lands be restored to the heirs of Layne, deceased, and they be required to pay back the purchase money which Hinchman and Johnson paid Layne, and that the same may be charged upon the lands; that Hinchman and Johnson may be paid for improvements and charged rents, as set forth in the contract of compromise, and that they be allowed credit for the $200 counsel fee; and the bill also contains a prayer for general relief, &c.

It is alleged in the bill that the widow and all the legal heirs of Layne, deceased, reside out of this State.

J. M. Byrnside, as guardian *ad litem* for Mary D. Layne and the other infant defendants, filed an answer, which is in the usual form, requiring proof of all the allegations in the bill. At December rules 1866 a decree *nisi* was entered against the adult defendants.

At January rules, 1867, the bill was ordered to be taken for confessed as to adult defendants, and the cause set down for hearing by the complainant's counsel.

On the 25th day of April, 1867, a decree was made in the cause, by the court, before any depositions were taken or evidence filed, other than the exhibits, so far as they were evidence, and the cause was referred to a master commissioner to take an account. In this decree, among other things, it is recited that "Sarah Miller, the wife of A. A. Miller, having departed this life leaving the following children and heirs at law, to-wit : James Miller, Elizabeth B. Miller, and George Miller, upon whose motion this cause is revived in their name, and more than two months having elapsed since the filing of the plaintiff's bill, and service of the subpœna upon the defendants Lewis Ballard, sheriff of this county, and as such administrator of Douglas B. Layne, deceased, Thomas G. Alderson, Sarah Davis, and Charles L. Davis, who failing to appear and answer the bill, the same is taken for confessed as to them, and the order of publication taken at rules against the defendants, Ann B. Layne, John J. Paxton and his wife, Orville T. Rodgers and his wife, William B. Sprowl and his wife, J. Emma Layne and Marietta Layne, and they still failing to answer, the cause is set down for hearing as to them, upon such evidence as the plaintiffs offered, and the cause coming on to be heard upon the bill, answer of the infant defendants, by their guardian *ad litem*, exhibits and arguments of counsel : Upon consideration whereof, &c."

Afterwards, on the 8th of July, 1867, the court made this decree in the cause to-wit: "On the petition of Lewis Ballard, sheriff of Monroe county, and as such

administrator of D. B. Layne, deceased, and others, and
for reasons satisfactory to the court, it is adjudged, ordered and decreed, that the decree rendered in this cause, at the April term, 1867, of this court, be set aside and annulled, and this cause be re-opened and re-heard, with leave to the defendants, or either of them, to file their answers within thirty days, and otherwise defend this suit, as they may deem advisable."

On the 19th of September, 1867, the widow and adult heirs of Layne, deceased, with leave of the court, filed their answer to the bill, to which the plaintiffs replied generally. This answer admits the sale of the lands on the 3d day of March, 1859, as charged in the bill, and that respondents suppose the six thousand dollars was paid as charged in the bill, but they have no personal knowledge of the fact. These respondents also say that "they suppose and believe that Lewis P. Holloway, who was appointed a committee for their ancestor, D. B. Layne, made the compromise as is alleged in the bill." But they deny that Holloway had the right or authority, to make the compromise made by him with Johnson and Hinchman, and insist that to make such a compromise was not within the scope and authority of the office of Holloway as such committee, and that in making it he transcended his authority, and that the alleged compromise is unequal and unjust, and ought not to be enforced by a court of conscience. They deny that the assessment valuation, made by Swope and Hines, filed by plaintiffs with their bill, is binding on them, it being *ex parte.* And they insist that Johnson and Hinchman having elected to make a contract of purchase "from an imbecile and weak-minded man, they should be compelled to abide by the same, and that the contract of sale, as originally made, should be confirmed and executed; but that if Johnson and Hinchman persist in asserting that Layne was a lunatic or weak and imbecile when the contract was made, and the contract of compromise should be confirmed, that, then, they should not

21

be allowed for the six thousand dollars paid. The answer concludes by praying substantially that the alleged compromise be adjudged null and void, or unequal, and that the contract of March 3d, 1859, be specifically, and specially executed.

On the 30th day of November, 1867, the court made a decree in this cause, as follows, to-wit: "It appearing to the court that in order to a proper decision of this cause, that the personal representative of Lewis P. Holloway, deceased, late committee of Douglas B. Layne, deceased, and also the securities of said Holloway, as such committee, should be represented in this suit, it is adjudged and decreed, that the plaintiffs amend their bill in this particular, so as to ascertain and make all the above named persons party defendants to this suit."

On the 29th day of April, 1868, the court, by decree, without deciding any questions presented in the cause, referred the cause to master commissioner, Alfred Phillips, to take an account, as therein specified.

On the 28th day of November, 1868, Lewis Ballard, sheriff, administrator, &c., appeared in court and filed a demurrer to the bill and the plaintiffs joined therein; and Ballard also filed his answer to which the plaintiffs replied generally. Ballard, in his answer, says that he never knew Douglas B. Layne, and cannot say whether he was sane or not; that he never knew Lewis P. Holloway, and he has no knowledge that Holloway was the committee of Layne, nor does he know that Layne was declared a lunatic; that he knows but little about the facts of the case, except what the papers in the cause show; that he believes it would be to the interest of the estate, which he represents to have the sale by Layne to Hinchman and Johnson confirmed, and that he thinks the equity of the case requires such decree.

On the 2nd day of December, 1868, the court made a decree reciting, that on that day the cause again came on to be heard upon the papers formerly read, and the report of master commissioner Alfred Phillips, made

pursuant to a previous order of the court, and the exceptions filed thereto, by the defendant's counsel, and was argued by counsel : It appearing to the court that the decree of the 30th day of November, 1867, requiring the plaintiffs to amend their bill, and make the personal representative of Holloway, a party defendant to the cause, had not been complied with, the court without acting on the report, or exceptions filed thereto, adjudged, ordered and decreed that unless the plaintiffs, within thirty days from that date, amend their bill and make the personal representative of Holloway a party defendant to the suit, "then the plaintiffs' bill should stand dismissed out of this court, with costs to the defendants, but without prejudice to any other suit which they might think proper to bring in the premises."

On the 18th day of May, 1869, the court, on motion of the administrator, widow and heirs at law of Layne, deceased, by an order made in the cause, granted to them leave to file a cross-bill within thirty days, against the plaintiffs, for the purpose of enforcing any rights of the defendants, if any they have, against the plaintiffs.

Afterwards, on the 5th day of June, 1869, a bill, called in the record a cross-bill, was filed in the clerk's office and process issued thereon, but said bill is in fact more in the nature of an original than a cross-bill. The plaintiffs, in the cross-bill, set up the contract of sale of the 3rd of March, 1859, and ask that the lands be sold to pay the purchase money, &c.

The infant defendants to this cross-bill answered the same, by guardian *ad litem*, on the 16th of September, 1869.

At the same time the adult defendants to the cross-bill filed their joint answer thereto. In this answer it is insisted "that the time for filing a cross-bill had transpired, there being a decree in the cause which it was not in the power of the court to vacate or disannul, and which settled the principles upon which a final decree should

be rendered." It is also therein objected that the cross–bill is, by law, an unnecessary pleading, and that the justice of the case did not require that it should be filed, and for that cause pray that the same may be dismissed. The answer then adopts the recitals and allegations of the original bill, and re-asserts them; but it alleges that there was paid of the purchase money of the land, not only the $6,000, alleged in the original bill, but also two additional sums, to-wit, $1,291.32, and $150, as shown by the report of commissioner Phillips filed in the cause. But no reason or excuse is stated why the two last named payments were not stated as alleged in the original bill. It also insists that the contract of compromise is valid and binding, and that it was, and is, fair and just, and does no more than restore Johnson and Hinchman to the position which they occupied before the purchase was made, &c.

To these answers to the cross-bill a general replication was filed.

Afterwards, on the 20th day of May, 1870, the cause was again heard upon the papers formerly read, the cross-bill, answers thereto, replication, exhibits and arguments of counsel, report of commissioner Phillips and excep-tions thereto, and the court, by its decree, rescinded, set aside and annulled the contract of sale of the 3rd of March, 1859, and determined and decided that the con-tract of compromise dated the 29th of March, 1861, made by Holloway, committee, and Hinchman and John-son, and filed as "exhibit 4," should be carried into effect and be duly executed. And the court, with the view of carrying into effect the last named contract, appointed M. J. Kester a special commissioner for the purpose, to complete the account directed to be taken by the decree of April, 1867, and referred the report of commissioner Phillips, with the exceptions thereto, to the special com-missioner, with authority to adopt or modify the same as he should think proper, from such evidence as was

then filed in the case, or might be brought before him; and the special commissioner was directed to report his proceedings to court. The court, in same decree, dismissed the cross-bill, at the costs of the plaintiffs therein.

On the 8th day of August, 1871, the cause came on to be further heard on the papers formerly read, and report of M. J. Kester, special commissioner, with the exceptions thereto, and the exceptions to depositions, and was argued by counsel; Upon consideration whereof the court adopted the second statement of this report, whereby it appears that the estate of D. B. Layne, deceased, is indebted to the plaintiffs in the sum of $8,540.11, as of the 18th of March, 1871, and decreed that the plaintiffs recover against the estate of Layne, deceased, the sum of $8,540.11, with interest thereon from the 18th day of March, 1871, until paid, and the costs of suit; and overruled all the exceptions to the report inconsistent with said second statement. The court further decreed that unless said sum, with interest and costs, were paid to the plaintiffs within thirty days from the date of this decree, that Samuel Price and others, who were appointed commissioners for the purpose, should proceed to sell the tract of land in the bill and proceedings mentioned, on Greenbrier river, after giving notice, &c.

After this decree was entered, the defendants to the original bill in the court below, appealed in the manner prescribed by law, and it is now the duty of this Court to determine whether there is error in the proceedings of the circuit court, or whether those proceedings shall be affirmed as being right, just and equitable.

I have given as full a statement of the proceedings of the circuit court in this cause as is necessary to present the material questions to be determined here, and, in my judgment, a statement less full would fail to present those questions in such manner as to make the case, and the points determined by this Court, clearly understood.

It must be observed that the original bill and the record fail to disclose when the committee Holloway died,

whether he died before or after Layne, or where he re-
sided at his death; nor does it anywhere appear that
Holloway ever had any money or personal effects of
Layne in his hands, or that there was any effects of Hol-
loway within this State at or after his death. But from
all that does appear in the record the reasonable pre-
sumption is that Holloway and Layne both resided and
lived before and at their deaths in Virginia. It does
not appear how long Holloway and Layne lived after
the date of the alleged compromise. Nor does the bill
or record disclose that the suit brought by Holloway,
as committee, was dismissed by Holloway in pursuance
of the compromise, or in accordance with the terms there-
of, in whole or in part; and they fail to allege or show
that the suit of Holloway, as committee, was dismissed
in pursuance of the alleged contract of compromise with
the approbation or approval of the court in which it was
pending, The bill does not allege that the suit was
caused to be dismissed by Holloway for any cause;
nor does it state when it was discontinued, or for what
cause; or whether it was discontinued before or after the
death of Holloway or Layne. No part of the record
of the proceedings had in the case, brought by Hollo-
way, is filed as an exhibit, or as evidence in this cause.
The only allegation in the original bill in reference to
the disposition of the suit is contained in one sentence,
and is as follows: "The suit brought by the said Lewis P.
Holloway, committee, &c., has been discontinued."
The bill and record fail to disclose whether D. B. Layne,
at the time the committee was appointed, had or was the
owner of, any estate, real or personal, other than that
involved in this suit; or whether there was any money
or property in the hands or under the control of Hollow-
way, as committee, at the date of the alleged compro-
mise or afterwards, with or by which he could refund
or pay to Johnson and Hinchman the purchase money
it is claimed they paid on their contract of purchase.
The bill does not allege or pretend that Hinchman and

Johnson under, or by virtue of, the alleged contract of compromise, ever delivered or offered to deliver, possession of the lands, or any part thereof, to Holloway as committee, or to any other person. The bill does not allege, nor is it anywhere admitted by the plaintiffs in the original bill, that Layne was a lunatic, or in anywise incapable of making a contract at the time he made the contract of sale to Hinchman and Johnson. The bill does allege that Johnson and Hinchman answered the bill filed by Holloway, denying the material allegations thereof. The bill does not allege, nor does the evidence show that the alleged contract of compromise was advantageous or beneficial to Layne to his estate; nor does the bill allege that the improvements for which compensation is claimed were permanent, valuable, or are still existing. The alleged contract of compromise is not filed with the bill, but a paper is filed marked "No. 4," which is alleged to be a copy, but no excuse for not filing the original paper is stated, and no evidence of the execution of the original is found in the record. Mary D. Layne, one of the legal heirs of D. B. Layne, an infant, and answers by guardian *ad litem.* The bill alleges that D. B. Layne purchased the four hundred and fourteen acre tract of land of Doctor Taylor, of Rockbridge county; it does not state whether Taylor had conveyed the land to Layne or whether the purchase money had been paid to Taylor or not. But it seems from the evidence of John Echols, as given in his deposition first taken in the cause, that Taylor's name was William, and that in the fall of 1859 he was dead, and there was then a large amount of purchase money due from Layne upon the four hundred and fourteen acre tract to the representatives and heirs of Taylor, and that no deed had been made to Layne for the land; that in order that a deed for the same might be procured' the bonds executed by Johnson and Hinchman to Layne for the purchase money of the land purchased by them from him, situate on Greenbrier river, in Monroe county,

were given to him (Echols) in the fall of 1859 by Layne, with instructions to collect upon them an amount sufficient to pay off what was still due from him to the heirs and representatives of Wm. Taylor, deceased, late of Rockbridge county ; that Hinchman and Johnson paid to him (Echols), the whole amount due on their first bond to Layne, and a portion of their second bond, which was sufficient to pay off the entire amount due to Taylor's representatives, and which was paid over to W. J. McDowell Taylor, of Rockbridge, who was attending to the matters for himself, and the other heirs of William Layne's and Mrs. Susan P. Taylor ; commissioner Phillips, in his report, says "that no money was ever paid into Layne's hands, but on the contrary, it all went to pay off a prior lien which existed on the land." The personal representatives and heirs of William Taylor, deceased, were never made parties to the cause.

The plaintiffs filed with their bill a copy of the order of the county court of Alleghany county, Virginia, made at the April term, 1860, thereof, appointing L. P. Holloway, committee to take charge of the estate of Douglas B. Layne. At the end of the copy is appended these words, to-wit: "A true transcript from the records of the said court. Teste : Joseph A. Fudge, Clerk." The copy is headed "Alleghany county court, April Term, 1860." This is the only record evidence found in the cause proving or tending to prove, that Holloway was appointed committee of Layne, deceased.

*First.* It is objected, and insisted by appellant's counsel that this copy should not have been read as evidence by the circuit court and cannot be in this Court, because it is not properly certified. It appears by the record that the reading of the copy as evidence, was excepted to in the circuit court upon the ground, that, "it is not properly certified," and also upon the ground that "it is not competent evidence." The order is, in the usual form, sufficiently full, and if it is sufficiently certified to, enti-

tles it to be read as evidence, it is competent, and in fact the proper evidence, to prove that Holloway was appointed committee for Layne, by the county court of Alleghany, at its date. By an act of the Legislature of this State passed on the 28th day of February, 1866, it is provided, "That a copy of any record, or paper, in the clerk's office of any court in the State of Virginia, or in the office of the Secretary of the Commonwealth, Treasurer, Register of the Land Office, or either Auditor, or any surveyor of the State, attested by the proper officer in whose office the same is, may be admitted in evidence in lieu of the original." See acts of the Legislature of this State of 1866, page 103. This provision of the Act of 1866, is re-enacted and continued in the Code of this State, enacted in 1868, and which took effect the first day of April, 1869, as may be seen by the fifth, sixth and seventh sections of chapter one hundred and thirty of the Code. These sections of the Code have not been repealed, and are still in force. The copy of the order under consideration is properly certified to entitle it to be read as evidence under the laws of this State, to which I have referred, and the objection made, that it is not properly certified, must be overruled.

*Second.* It is also objected by the appellants, that all the orders, decrees and proceedings of the circuit court made in the cause, after the 2nd day of December, 1868, are erroneous, and should be reversed and set aside, because the decree made by the court, at that date, adjudged, that unless the plaintiffs, within thirty days from the date of the decree, amended their bill, and made the personal representative of Holloway, a party defendant to the suit, that then the plaintiffs' bill should stand dismissed out of this court, with costs to the defendants, but without prejudice to any other suit," &c.; and as the plaintiffs failed to so amend their bill, within the thirty days, the cause, by operation of the decree, stood dismissed out of court.

22

From the proceedings of the court, and the acts and doings of all the parties in the cause, subsequent to the date of the decree, it is evident that neither the court, or any of the parties, regarded the decree as amounting to an absolute dismissal as now insisted. The defendants in the circuit court, at the May term, 1869, after the date of the decree, on motion, obtained leave of the court to file a cross-bill in the cause. They afterwards did file their cross-bill to which the defendants therein filed their answers. A large number of depositions were taken in the cause, after the decree, by each of the parties, and, so far as can be seen from the record, no objection was made by either party to the cause being proceeded with, by the circuit court, and heard and determined, on account of, or by reason of, the cause being dismissed or out of court. It was at the instance of the appellants that the first action of the court was had and taken in the cause, after the expiration of the thirty days from the date of the decree. It is clear that the court, after the decree was made, became satisfied that it was not necessary that the personal representative of Holloway should be made a party in order to a final and proper decree in the cause, as between plaintiffs and defendants therein ; or else it would have refused to proceed with the cause, unless such personal representative was made a party. Under all the circumstances appearing in the cause, I think it would be unequitable and wrong to hold that the proceedings of the court, after the expiration of thirty days from the date of the decree, are erroneous, and should be reversed for the cause claimed. If the decree was regular and proper, in any case, according to its terms, literally considered, and without looking to the object and purpose of the court in making it, still I think, under all the circumstances, it may be held, properly, that the parties consented to the cause being proceeded with. In the case of *Brown v. Belches*, 1 Wash., 9, it was *held*, that "after reference to arbitrators whose award, it was agreed, should

be the judgment of the court, a trial was had, by jury,

without discharging the order of reference ; yet the verdict and judgment were not set aside, it being inferred that the trial was by consent." I do not think it was necessary that the personal representative of Holloway should have been made a party to the cause, in order to its proper decision, looking to the objects of the bill ; and if the circuit court had dismissed the bill, absolutely, for this cause, the decree of dismissal would have been erroneous and so treated, by an appellate court. It is manifest that the appellants, after the expiration of the thirty days, by their acts and doings throughout, recognized the cause as not being dismissed, but as still being in court, to be proceeded with to determination, and so of the circuit court, and plaintiffs in the cause. The decree, so far as the record discloses, was not made at the instance of the appellants, but by the court of its own motion, and to allow the appellants objection, now made for the first time, to prevail, under the circumstances, would, it seems to me, operate evil, surprise and injustice, in practice, without accomplishing any valuable end or purpose in this cause. This objection of the appellants must, under the circumstances, appearing by the record in this case, be overruled as not being well taken here.

*Third.* It is objected by appellants, that the court erred in not overruling the demurrer filed to the plaintiffs bill before proceeding to decree. It must be considered that the court, in making the decree of May 20, 1870, did consider the sufficiency of the bill and substantially overrule the demurrer. This objection must therefore be overruled.

*Fourth.* It is also objected, by the appellants, that the decrees of the circuit court of the 20th of May, 1870, and of the 8th of August, 1871, are erroneous, and should be reversed, because, under the circumstances, the alleged contract of compromise and recission set up in the bill, and prayed to be enforced against the personal represen-

tative and legal heirs of D. B. Layne, deceased, ought not to be enforced by a court of equity. This objection presents for consideration and determination questions of great importance and interest, not only to the legal profession but to all citizens. And I enter upon their consideration with a full appreciation of their great importance as well as distrust of my ability to give them a just and proper solution. Notwithstanding the law authorizing the county and circuit courts to appoint committees for lunatics, was enacted, and in force for many years in Virginia prior to the formation of this State, and has been continued in force in this State, since its formation, as to the circuit courts, strange, as it may appear, there has not heretofore been any decision, by the Supreme Court of Appeals of either State, defining the powers and authority of the committee, over the real and personal estate of the lunatic, his right to make contracts in relation thereto, the extent of such right, and how far it is the duty of the courts to enforce the same, under the law. I have not been able to find a case in either State where a bill has been filed to enforce the specific execution of a contract of a committee of a lunatic, for the purchase or sale of real estate, or for the enforcement of a contract of recission such as is presented in this case, or in anywise analagous thereto in principle.

The alleged contract of recission and compromise is in these words, viz: "This article of agreement, made and entered into this 29th day of March, 1861, between Lewis P. Holloway, committee of D. B. Layne, of the one part, and William Hinchman, Jr., and Thomas Johnson, of the other part, witnesseth: That the said Lewis P. Holloway pledges himself to come to the house of the said Thomas Johnson on the 18th day of April, 1861, for the purpose of consummating a compromise of a suit in chancery instituted in the circuit court of Monroe county, in which said Holloway is plaintiff and the said Hinchman and Johnson are defendants, upon the following terms here agreed upon, to-wit: That the said

Lewis P. Holloway binds himself to pay to said John-
son and Hinchman, the amount of money they have
paid to John Echols for land bought of D. B. Layne, with
interest from the time of said payment until all of it is
refunded by said Holloway; and said Holloway is to re-
turn to them, the said Hinchman and Johnson's bonds
given to said Layne for the purchase money for said
land; and the said Holloway is to pay said Johnson and
Hinchman's lawyer's fee, amounting to $200, and to dis-
miss the suit upon the terms, to-wit: That each party
is to pay his own costs in said suit. The said Johnson
and Hinchman are to pay the said Holloway rent for the
said land during the time they occupied it, and the said
Johnson and Hinchman are to have possession of said
land until Christmas and have the privilege of moving
their grain, &c., and are to pay said Holloway for the
corn and oats they sow and raise this season, the usual
grain rent; and the said Holloway is to pay the said
Johnson and Hinchman for the improvements they have
made upon said land, and if they cannot agree as to the
value of said improvements they are to choose disinter-
ested persons to value same. The said Holloway is to
take for the rent of the islands, rented by the said
Hinchman and Johnson the usual grain rent, or the rent
that said Johnson and Hinchman are to get for the same.

Witness the following signatures and seals:

(Signed.)  LEWIS P. HOLLOWAY, COM.,   (Seal.)
          THOMAS JOHNSON,          .  (Seal.)
          WILLIAM HINCHMAN.           (Seal.)"

The fiftieth section of chapter eighty-five, of the Code
of Virginia of 1860, provides that, "If a person be
found to be insane, by justices before whom he may be
examined, or in a court in which he may be charged
with crime, as aforesaid, the court of the county or cor-
poration, of which he is an inhabitant, shall appoint a
committee of him." The fifty-second section of same
chapter provides, that, "If a person residing in this
state, not so found, be suspected to be insane, the court

*1874.
January Term.*

*Hinchman,
Admr.,
v.
Ballard, Admr.*

of the county or corporation of which such person is an inhabitant, shall on the application of any person interested, proceed to examine into his state of mind, and being satisfied that he is insane, shall appoint a committee of him." The fifty-third section of the same chapter gives the circuit courts concurrent jurisdiction with the county courts in such cases. The fifty-fifth section of same chapter of same Code, provides that, "The committee of an insane person shall be entitled to the custody and control of his person (when he resides in the State, and is not confined in an asylum or jail), shall take possession of his estate, and may sue and be sued in respect thereto, and for the recovery of debts due to, or from, the insane person. He shall take care of and preserve such estate, and manage it to the best advantage; shall apply the personal estate or so much as may be necessary, to the maintenance of such insane person, and of his family, if any; and shall surrender the estate, or so much as he may be accountable for, to such insane person, in case he shall be restored to sanity, or the real estate to his heirs or devisees, and the personal estate to his executors or administrators, in case of his death without having been so restored to sanity." The fifty-sixth, fifty-seventh and fifty-eighth sections of same chapter, provide that if the personal estate of such insane person be insufficient for the discharge of the debts, or if the personal estate or the residue thereof, after payment of the debts, and the rents and profits of his real estate, be insufficient for his maintenance, and that of his family, if any, the committee of his estate may petition the court, by which he was appointed, for authority to mortgage, lease or sell, so much of the real estate of such insane person as may be necessary for the purposes aforesaid, or any of them; setting forth in the petition the particulars and amount of the estate, real and personal, the application which he has made of any personal estate, and an account of the debts and demands existing against the estate; and that on the presenting of

such petition it shall be referred to a commissioner in chancery to inquire into and report upon the matters therein contained; whose duty it shall be to make such inquiry, to hear all parties interested in such real estate, and to report thereon with all convenient speed; and if, upon the coming in of the report and examination of the matter, it shall appear to the court to be proper an order shall be entered for the mortgage, leasing or sale (on such terms and conditions as the court may deem proper), of so much of the said real estate as may be necessary. But no conveyance shall be executed until the sale shall have been confirmed by the court. The proceeds of the sale shall be received and applied under the order of the court.

The first section of chapter thirty-six of the Code of 1860 provides, that where an infant, insane person or married woman is entitled to or bound to renew any lease, any person on his or her behalf, or any person interested, may apply, by petition or motion, in any summary way, to the circuit court of the county or corporation in which the lands leased, or some part thereof, may lie, and by the order of the said court any person appointed by it, may, from time to time, surrender, or accept a surrender, of such lease, or take or make a new lease of the same premises, for such term and with such provisions as the court shall direct. Such reasonable sums as may be incurred to renew any such lease shall, with interest thereon, be paid out of the profits of the leasehold premises and be a charge thereon till such payment.

And the second section of the same chapter provides, that if the guardian of any minor, or the committee of any insane person, think that the interest of the ward or insane person will be promoted by a sale of his estate, or estate in which he is interested with other infants or adults such guardian or committee, whether he or the minor, insane person or any of the persons interested reside in this State or not, may for the purpose of obtaining such

sale, file a bill in equity in the circuit court of the county or corporation in which the estate proposed to be sold, or some part thereof may be, stating plainly all the estate, real or personal, belonging to such infant or insane person, and all of the facts calculated to show the propriety of the sale: That the bill shall be verified by the oath of the plaintiff and the infant or insane person, and all others interested, shall be made defendants; and also where there is an infant or insane defendant, all those who would be his heirs or distributees, if he were dead, shall be made defendants. In subsequent sections of the same chapter it is provided, that to every such infant or insane defendant there shall be appointed a guardian *ad litem*, who shall answer the bill, on oath, in his proper person : That no deposition shall be read in the suit against any infant or insane person, unless it be taken in the presence of the guardian *ad litem*, or upon interrogatories agreed on by him : That if it be clearly shown, independently of any admissions in the answers, that the interest of the infant or insane person will be promoted, and the court is of opinion that the rights of no person will be violated thereby, it may decree a sale of said estate, or any part thereof, taking for the purchase money, when the sale is on credit, ample security; and, if the sale be of real estate, retaining a lien thereon : That at such sale the guardian, or guardian *ad litem*, or committee, shall not be a purchaser directly or indirectly : That the proceeds of sale shall be invested, under the direction of the court, for the use and benefit of the persons entitled to the estate. But into whosoever hands the proceeds may be placed, the court shall take ample security, and from time to time require additional security, if necessary, and make any other proper orders for the faithful application of the fund, and for the management and preservation of any property or securities in which the same may be invested, and for the protection of the rights of all persons interested therein, whether such rights be vested or contingent: That what

may be received under this, or the one hundred and twenty-fourth chapter, for the real estate of an infant or insane person, sold or divided, or so much thereof as may remain at his death intestate, shall, if he continue till his death incapable of making a will, pass to those who would have been entitled to the land if it had not been so sold or divided.

Each and all these provisions of the Code of 1860 were in force in Virginia at the time Holloway was appointed committee, and continued in force therein until the formation of this State, and from thence till the adoption of the Code of 1868 of this State, now in force; and were substantially, if not literally, re-enacted and contained in the Code of 1868, except the last sentence of section two of chapter of one hundred and twenty-eight, and are still in force.

In the laws as contained in the Code of 1860, which I have quoted, and the ancient established rules governing courts of equity, is to be found, and from them is deduced, the power and authority of the committee Holloway to make the alleged contract of recision and compromise set up in this case, if such power and authority exists. From the laws cited by me, we see that although the committee is required to take possession of the estate of the lunatic, and may sue and be sued in respect thereto, still if the personal estate of the insane person is not sufficient for the discharge of his debts, or if the personal estate or residue thereof after payment of the debts, and the rents and profits of his real estate are insufficient for his maintenance and that of his family, the committee is not authorized to mortgage, lease or rent the realty of the insane person to raise money for the purpose. But the court, by which he was appointed, upon the petition of the committee, upon a proper case being made thereon, after all parties interested are heard, is empowered to make an order to direct the realty, or so much thereof as may be necessary for the purpose, to be mortgaged,

23

1874.
January Term.

Hinchman,
Admr.,
v.,
Ballard, Admr.leased or sold, and no conveyance to be executed until the sale, where one is directed, is confirmed by the court, and the proceeds of the sale to be secured and applied under the order of court. Also, when the interest of the insane person will be promoted by a sale of his estate, the committee, for the purpose of obtaining such sale, is authorized and empowered to file a bill in equity, verified by his oath, in the circuit court of the county in which such estate, or part thereof is situated. A guardian *ad litem* is required in such case to be appointed to defend the interest of the insane person involved in the the suit, and no deposition can be read therein, unless taken in presence of the guardian *ad litem*, or upon interrogatories agreed on by him. And at the hearing of the case, if it be clearly shown, independently of any admissions in the answers, that the interest of the insane person will be promoted, and the court is of opinion that the rights of no person will be violated, it may decree a sale of the estate, or any part thereof. But the whole proceeding is to be under the direction of the court, and the proceeds of the sale to be invested under its direction for the benefit of the insane person. To such bill the law, as contained in the Code of 1860 required that all those who would be the heirs or distributees of such insane person, if he were dead, should be made defendants. Also, whatever is received for the real estate of the insane person, under chapter one hundred and twenty-eight, or as much thereof as may remain at his death, intestate, shall, if he continue till his death incapable of making a will, pass to those who would have been entitled to the land if it had not been sold. The committee is required to take care of the estate and manage it to the best advantage—to apply the personal estate, as far as necessary, to the payment of debts of the insane person, and the rents and profits of the residue of his estate, real and personal, and the residue of the personal estate, or so much as may be necessary to the maintenance of the insane and his family ; and shall surren-

der the estate, or so much as he may be accountable for to the insane person, in case he is restored to sanity, or the real estate to his heirs or devisees, and the personal estate to his executors or administrators, in case of his death without having been restored to sanity.

The committee is not authorized to change the nature of the estate of an insane person without the direction or approval of a court having jurisdiction of the subject.

Fonblanque in his work on Equity says, "the committee of a *non compos* is but a bailee, and accountable to his representatives." Side page 57. In *ex parte March-ioness of Annandale*, 1 Ambler 81, Lord Hardwicke states it to be "a rule never departed from, not to vary or change, the property of a lunatic, so as to effect any alteration as to the succession to it;" but in *ex parte Grim-stone*, 1 Ambler 706, Lord Apsley, C., decreed incumbrances paid off in the lifetime of the lunatic, out of savings of the estate, to be assigned to attend the inheritance, and not in trust for the next of kin; he considering the ruling principle in the management of a lunatic's estate, to be the doing of that which is most beneficial to the lunatic. "In the management of a lunatic's estate, the interest of the lunatic is more regarded than the contingent interest of those who may be entitled to the succession. And the court, if it be for the interest of the lunatic, will direct timber, on the land of the lunatic, to be sold. So the real estate may be converted into personal, or personal into real, if for the benefit of the lunatic." 3 Johns. Ch.(N. Y.)347. "If the committee misconducts himself or becomes bankrupt, he will be removed." 2 Mad. Ch. 745. "The committee of a lunatic's estate is not authorized to purchase real estate with savings, and alter the nature of the property; and land so purchased will be considered as personal estate." Same author 747. "Money may be laid out in improvements, if no good reason be shown why it should not. But in these cases the committee acts at his peril, unless he has pre-

viously procured an order of the court, which it is always prudent to obtain." Same author 749. I think it is clear that the conduct and acts of a committee of an insane person, in relation to the estate of a lunatic, are subject to the direction, rescission, approval or disapproval of the court having jurisdiction of the subject.

It is competent for the committee in a proper case to institute suit to set aside acts done by the insane person during his lunacy, and prior to the appointment of the committee, especially where such acts are prejudicial, and not beneficial to the interest of the lunatic. But it is for the court to say whether the act shall or ought to be set aside under the circumstances of the case. Chief Justice Story, in the first volume of his Eq. Juris. section 228, says: "But courts of equity deal with the subject upon the most enlightened principles; and watch with the most jealous care any attempt to deal with persons *non compotes mentis*. Wherever, from the nature of the transaction, there is not evidence of entire good faith (*uberrimœ fidei*) or the contract or other act, is not seen to be just in itself, or for the benefit of these persons, courts of equity will set it aside, or make it subservient to their just rights and interests. And so, if a purchase is made in good faith, without any knowledge of the incapacity, and no advantage has been taken of the party, courts of equity will not interfere to set aside the contract, if injustice will thereby be done to the other side, and the parties cannot be placed *in statu quo* or in the state in which they were before the purchase."

It cannot be held with any assurance or confidence of safety to the unfortunate insane, their families or estates, that the fact, that a committee may sue or be sued touching the real estate of the insane person, gives him such complete control, and arbitrary discretion in the disposition of the subject of the suit, as to authorize him, at his pleasure, to make a contract of compromise with the same binding and conclusive effect against the

insane person, his estate, heirs, or representatives, as if it were his own property, and he was acting for himself in the premises. Where such contract is made by a committee of an insane person, it should be done by the direction or receive the sanction of the court in which the cause is pending, or of the court by which he was appointed, especially when it changes the nature of the estate or any part thereof, or disposes of the subject of the suit, as in this case, in whole, or part; otherwise it must be held that the contract, in and of itself, is not binding, as against the insane person, his estate, personal representatives or legal heirs. I apprehend that a court of equity will, in no case, give effect to such contract, where it is made without the direction or sanction of the court, as before indicated, and without being satisfied, after careful and full examination of the transaction, that the compromise was proper, and beneficial to the interest of the insane person. To hold otherwise would be to disregard the true spirit, if not the letter, of the law, and to leave the insane and their estates, easy victims to inconsiderate or unscrupulous committees. A committee of an insane person should not institute a suit to set aside a contract made by the insane person prior to his appointment, on the ground of insanity, unless the person was insane, or there are reasonable grounds to believe he was insane, at the time the contract was made. If the person was sane when the contract was made, and the contract is otherwise valid and binding, the court would not set it aside. And though the person was insane when the contract was made, still if it clearly appears that the transaction was in good faith and was beneficial to his interests, the court will not set it aside, in all cases, as a matter of course, at the instance of the committee. So, if a purchase is made in good faith, without any knowledge of the incapacity, and no advantage has been taken of the insane party, a court of equity will not interfere to set aside the contract, if injustice will thereby be done to the other side,

1874.
January Term.

Hinchman,
Admr.,
v.,
Ballard, Admr.

and the parties cannot be placed *in statu quo*, or in the state in which they were before the purchase. Therefore, if Layne, deceased, at the making of the contract of the 3d of March, 1859, had sufficient capacity to make the same, the contract being otherwise good, then the committee, Holloway, had no right to sue to set it aside, for that cause, or to rescind the same by contract of compromise, or otherwise. In that case it was his duty to enforce the performance of the contract so far as in his power. The plaintiffs do not claim in their bill that Layne was insane on the 3d of March, 1859, that he then did not possess sufficient capacity to make the contract of sale. The evidence in the cause proves that the land was sold at its full value; and if the annual rents and profits of the land are not worth more than is claimed by the plaintiffs and as a majority of the witnesses examined on that subject prove them to be worth, then the annual interest of the twelve thousand dollars, the purchase money, is worth near three hundred dollars more than the annual rents and profits of the lands. Further, it appears that Layne, at the time he made the sale, was indebted on the purchase money of the four hundred and sixteen acre tract, to Taylor's representatives and heirs in the sum of six thousand dollars or seven thousand dollars and that this debt was a lien on the land; and, for aught that appears in this record, Layne had no means to pay it, except by a sale of the land. Layne, it seems, not long after the sale, placed the purchase money bonds, or part of them, given to him by Johnson and Hinchman, into the hands of John Echols to collect and apply so much thereof as necessary to pay the purchase money he was in arrear to Taylor's representatives, in order that he might obtain a deed for the land; and Echols did collect of the bonds over seven thousand dollars, sufficient to pay the balance of purchase money in arrear from Layne to Taylor's representatives, and paid the same in discharge thereof. Shortly after all this was done, Holloway was appointed

committee, and no part of the residue of the purchase money, contracted to be paid by Hinchman and Johnson to Layne has ever been paid, which, at this time, including interest, must amount to seven thousand dollars, or perhaps more. The plaintiffs prove, by some four or five witnesses, who were well acquainted with Layne, some of whom transacted important business with him after the 3d of March, 1859, that he was of sufficient capacity to transact business at that date and afterwards, and before the date of the appointment of committee, Holloway. Commissioner Phillips, who was directed to enquire and report on the subject, in his report to the court, says, "that, from all the evidence presented to him, he is of opinion that the mental incapacity of Douglas B. Layne, deceased, at the time he made the contract with Johnson and Hinchman was not of such a character as to unfit him from making a valid contract."

The defendants at some stage of the case, took the depositions of several witnesses to prove that Layne was insane on the 3rd of March, 1859, and before and after; but none of these witnesses were the attending physician of Layne, if he had any, or experts in such cases, and they simply give their opinions, generally, as to the state of his mind without stating the facts, circumstances or anything upon which their opinions are based, and none of them seem to have been present when the contract was made, or testify that they saw him on that day. Such evidence, while perhaps it may be read and considered, is entitled to but little weight or force, in and of itself, and is, I think, alone, generally insufficient to authorize a court to declare or decide, any person to be insane, especially where it is otherwise shown, by the circumstances and other competent evidence. "But the mere fact that a person is of weak understanding, if there be no fraud or surprise, is not an adequate cause of relief." Adam's Equity 432 and 433. "Mere weakness of mind, short of actual idiocy or insanity, whether produced by old age or other causes, is not enough to call for the in-

1874.
January Term.

Hinchman,
Admr.,
.v.
Ballard, Admr.

terference of equity; but where there is imposition or undue influence, it will be a very important ingredient in determining the question of fraud." Same author 433, note 1 and authorities there cited. I do not understand the defendants to claim that the depositions taken and filed by them are sufficient to establish the incapacity of Layne to contract. In their answer and cross-bill they claim the enforcement of the contract of the 3d of March, 1859. In this case, under the circumstances, and facts, as they appear, the contract of sale of the 3d of March, 1859, was sensible, prudent, and beneficial to the interests of Layne, and was *bona fide* and made without undue influence or fraud. I see no cause for its recission, and none appears to have existed at the date of the alleged contract of compromise and rescission. Johnson and Hinchman were placed in possession of the property about the time they made the purchase, and they have had the uninterrupted use and enjoyment thereof ever since. It is not alleged, nor does it appear, that Holloway, as committee, had money or property with which to refund to Johnson and Hinchman the purchase money they had paid; and so far as the court can see the money could not have been raised by him, except by a sale of the land. This he could not do, and the sale would most likely had to have been made at public auction, at the suit of Johnson and Hinchman, no matter what the sacrifice, as now insisted by the plaintiffs. It would seem this must have been contemplated as the result. The alleged compromise changes the nature of the estate; it provides, in effect, that the estate of Layne shall pay the plaintiffs' costs in the suit brought by Holloway and $200 counsel fee of Johnson and Hinchman, and that Johnson and Hinchman should be paid for improvements, whether beneficial or not, and without ascertaining the amount. It also provides for the payment of interest to Johnson and Hinchman upon the money paid by them, and for the payment of rent by Johnson and Hinchman. The value of the improvements and rent was to be ascer-

tained in future. It does not fix the rent at the interest on the purchase money. Why Holloway never attempted to consummate the alleged compromise is not stated. He may have died—his powers may have ceased soon after its date, or he may have been advised that he had not power to make it, or concluded, that if consummated, it would be injurious and detrimental to the interests of Layne. Be this as it may, as the case is presented the alleged compromise was not and is not beneficial to the interest of Layne, but prejudicial thereto, and should not be enforced against his personal representatives and legal heirs.

If Holloway, as committee, could make a contract binding upon the insane person, his estate, personal representative or heirs of the character I have been considering, and a court of equity would enforce it, still I do not think the alleged contract is a final contract, such as courts of equity require to entitle the party claiming the benefit thereof to a decree of specific performance. Lewis P. Holloway pledges himself to come to the house of the said Thomas Johnson on the 18th day of April, 1861, for the purpose of consummating a compromise of a suit, &c., upon the following terms here agreed upon, to-wit, &c.: The word 'consummating,' as here used must be construed to mean 'completing' the times of payment of the money Johnson and Hinchman had paid Echols is not fixed, though it is evident it was not contemplated that it should all be paid in hand. The amount of the rent to be paid is not specified, except the rent for that season. Holloway is to pay Johnson and Hinchman "for the improvements they have made upon said land, and if they connot agree as to the value of said imrovements, they are to choose disinterested persons to value the same." The number of persons to be chosen, or who, in case of disagreement, are not specified. The contract of sale of 3d of March, 1859, is not mentioned, or the description of writing Hinchman and Johnson

24

1874.
January Term.

Hinchman,
Admr.,
v.
Ballard, Admr.
are to make and deliver, reconveying or transfering the interest they acquired in the lands by the contract of 3d of March, 1859, and the assignment of exhibit No. 2, and the deed made to them by John Alderson for part of the land. From a careful consideration of all the circumstances and facts, and a careful examination of the writing. It appears to me that the writing is at most only the terms agreed on as a basis of an agreement, and not the agreement itself. There is no binding agreement such as equity will enforce by decree of specific performance, when the writing appears only to be terms agreed on as a lien for an agreement, and not the agreement itself; or when it provides that any of the terms are afterwards to be settled, or when the matter is unconcluded, and one party may still withdraw his consent, or where there appears any design of further negotiation. Fry on Specific Performance of Contracts, New Am. Ed, 230 and 342; *Graham v. Call, Executor,* 5 Munf, 396; *Milnes v. Gery,* 14 Ves. Ch. (Jr.), 400; *Baker v. Glass,* 6 Munf. 212, and the cases there cited. But whenever the formal agreement contemplated is to be anything more than ancillary to the real agreement; whenever any new term might be introduced into the formal agreement not contained in the earlier one, the first agreement, will not be binding. And whenever the conclusive nature of the arrangement does not evidently appear in the writing, the fact that a subsequent and more formal agreement was intended to be entered into, will be strong evidence that the previous negotiations were not intended to amount to an agreement. Fry on Specific Performance of Contracts, 233.

The court will refuse to act, even when it only rests reasonably doubtful whether what passed was only treaty, let the progress towards the confines of agreement be more or less. Per. Lord Eldon in *Huddleston v. Briscoe,* 11 Ves. Ch. (Jr.) 592; Fry on Spec. Per. Con., 232.

For these reasons, I think said decrees are also erroneous, and should be reversed.

*Fifth.* It is also objected by the appellants that it was error in the circuit court to decree a sale of the land without the personal representative and legal heirs of William Taylor, deceased, being made parties to the plaintiffs' bill. As the case appears, this objection is well taken. It would prejudice the sale of the property to sell it without the court first ascertaining if the lien of Taylor for purchase money had been satisfied, and providing for its satisfaction, if not satisfied. And, as before remarked, it seems that the legal title is still in Taylor's heirs, or at least it does not appear in the case that Taylor or his heirs conveyed the four hundred and fourteen acres of land, although it is probable the conveyance should be made. For these reasons, the personal representative and legal heirs of Taylor should have been made party defendants before decree of sale, otherwise, the sale, if made, would be prejudicial. "If it appear on the face of the record that proper parties to the suit are wanting, the decree will be reversed, unless the objection was expressly relinquished in the court below." *Sheppard's Ex. v. Starke,* 3. Munf. 29; *Clark v. Long,* 4 Rand 451.

*Sixth.* The appellees insist that the court erred in allowing Ballard, administrator, and the widow and heirs of Layne, deceased, to file their answers, and also the cross-bill, after the decree of 25th of April, 1867 ; and also erred in setting aside that decree on the 8th of July, 1867.

The decree is interlocutory and might be opened or set aside by the court on petition for a rehearing. *Laidley v. Merrifield,* 7 Leigh, 346. *Cocke's Adm'r v. Gilpin,* 1 Rob., 20. In the case last cited judge Baldwin, on page 31, says : "Where can be the mischief or inconvenience, whenever the judicial action of the court itself, in the cause, has not been perfected, of permitting it to control the ministration of its servants, and even to turn back and correct its own errors of omission and commission, instead of driving the parties into an appellate forum ?" The fifty-third section of chapter one hundred and twenty-five of the Code of this State is in these words :

1874.
January Term.

Hinchman,
Admr.,
v.
Ballard, Admr.

"At any time before final judgment, or decree, a defendant may file a plea or answer; but if the same be not filed in due time, an action or suit shall not be thereby continued, unless the court shall, for good cause, so order." The decree was set aside "on the petition of Lewis Ballard, sheriff of Monroe county, and as such administrator of D. B. Layne, deceased, and others, and for reasons satisfactory to the court." The petition is not copied into the record, and this Court is therefore uninformed of its contents. But it does not appear, by any return, that process in the cause was served on Ballard, or any other party; nor does it appear that an affidavit was filed of the non-residence of any of the parties; nor is there an order of publication, in the record, as to any absent defendants; nor does it appear, either in the decree of 25th of April, 1867, or elsewhere, that an order of publication had been duly executed as to any absent defendants. In this condition of the record this Court will not determine that the decree of the 8th of July, 1867, was, or is, erroneous, when it can well see, from the record, why it may have been right and proper. After the decree was set aside, without objection, so far as the record discloses, Layne's widow and heirs appeared and filed their answer, with leave of the court, without objections from the plaintiffs, and the defendants filed their general replication thereto. Afterwards the court granted leave to Ballard and the widow and legal heirs to file a cross-bill in the case, which was done. Much of the reasoning applies to this objection of appellees, which has been given for overruling the appellants' objection, that the plaintiffs' cause was dismissed and out of court after the expiration of thirty days from the date of the decree of 2nd of December, 1868. Besides, I do not see what the objection could avail, if sustained, because the view taken in this opinion of the merits of the case reaches and applies as well to the decree of the 25th of April, 1867, as to any other decree in the cause. The objection of appellees to the

decree of July 8, 1867, and to the filing of the cross-bill must, under the circumstances, be overruled. The contract of sale of the 3rd of March, 1859, must be carried into effect, if it can be done according to the principles governing courts of equity in such cases; and the Court does not see, from anything now appearing, why it may not be done. But before the case is further proceeded in, with that view, the cross-bill, as it is called, must be amended, and Mary D. Layne, the personal representative and legal heirs of A. W. G. Davis, deceased, and the personal representative and legal heirs of William Taylor, deceased, must be made party defendants thereto, and all other persons in interest, not now parties, with proper averments.

Several other points were made in the case by the appellants, but under the views expressed upon the merits of the case, and the disposition which must be made of it, those points are immaterial, and are not necessary to be now considered and determined.

For these reasons the decrees rendered in this cause, by the circuit court of the county of Monroe, on the 20th day of May, 1870, and the 8th day of August, 1870, must be reversed and annulled and the appellants recover against the appellees their costs in this Court expended. And this Court proceeding to render such decree as the court below should have rendered, it is adjudged, ordered and decreed that the original bill filed in the cause be dismissed and that the defendants in said original cause recover against the plaintiffs therein their costs about their defence in the court below therein expended. But this dismissal of said original bill is without prejudice to any of the rights of the defendants therein, or any of them under the said contract of sale by Douglas B. Layne to Thomas Johnson and William Hinchman, Jr., of the lands in the original bill mentioned, and without prejudice to any rights set up in the said cross-bill and the right to prosecute the same furth-

er as hereinafter directed.  And the cross-bill cause must be remanded to the circuit court of Monroe county with leave to the plaintiffs therein to file an amended bill,  making additional parties, and for further proceedings to be therein had as though it was an original bill, according to the principles decided in the foregoing  opinion, and the rules governing courts of equity.

PAULL and MOORE, Judges, concurred.

HOFFMAN, Judge, did not sit in the argument and decision of the case, by reason of sickness.

DECREES ON ORIGINAL BILL REVERSED AND CROSS-BILL CAUSE REMANDED FOR FURTHER PROCEEDINGS.